[Crim. No. 4518. In Bank. Feb. 24, 1944.]

THE PEOPLE, Respondent, v. WILLIAM SHAW, Appellant.

 

No appearances.

SCHAUER, J.—In an information filed by the District Attorney of San Bernardino County, defendant was charged with the murder of Pecola Shaw. The defendant entered pleas of not guilty and not guilty by reason of insanity; he subsequently withdrew the latter plea. A jury found him guilty of murder of the first degree and made no recommendation as to penalty. Upon such verdict the defendant was sentenced to death. This is an automatic appeal from the judgment as provided by subdivision (b) of section 1239 of the Penal Code. No brief has been filed and no appearance made on behalf of defendant herein. It has therefore been necessary for us independently to examine the record of the proceedings. From such examination it appears that the judgment must be affirmed.

From the testimony the following facts appear: In 1941 the defendant left San Bernardino, where he and his wife Pecola had resided, and went to Oakland. Although the defendant provided a home for her in Oakland, his wife would not leave San Bernardino, where she resided in a rooming house owned or maintained by the witness Garland Hardage, known in his local community as King George. She stayed at the Hardage house intermittently over a period of about two years, receiving money regularly from the defendant and visiting him occasionally in Oakland. In May, 1943, the defendant returned to San Bernardino and moved her from Hardage's house. About a week before June 4, 1943, the date when she was killed, Mrs. Shaw left the defendant and went back to the Hardage house. The defendant testified that about five days before the killing, after an unsatisfactory conversation with his wife and Hardage, "A voice spoke to me and said to be sure and kill her." The next day he saw her on the street intoxicated and supported by two Negro soldiers, and he decided then that he "would rather she be dead than in the condition she was living."

About midnight on June 3, Shaw broke into the Hardage

residence. Hardage, wakened by the noise, got his shotgun and fired one shot downward through the door into the hall. He heard the intruder leave the house, and he and Pecola went "to call the law." As they returned, they saw the defendant across the street. Shaw waited near by until the police who answered the call and Hardage left the house to look for him. He then broke into the house again, with a pocket knife open in his pocket. Pecola picked up the shotgun, the defendant stabbed her once, and she dropped it. He continued to cut her as she, struggling and "hollering," went out the door, across the porch, and fell in the yard. She was stabbed more than fifty times.

The defendant proceeded down the street and two neighbors who had been interested spectators called an ambulance. There is testimony that while the deceased lay in the yard she said that she was bleeding to death and that her husband, William Shaw, had cut her.

The defendant caught a freight train to Victorville that night, and was arrested after his return to San Bernardino the following night. The officers testified to statements of the defendant made shortly after his apprehension, in which he confessed and recounted the circumstances of the homicide. Defendant testified to the same effect at the preliminary examination, and this evidence was introduced at the trial. Also, defendant took the stand and confirmed his previous statements and the testimony of other witnesses.

The record discloses no prejudicial error and the proceedings appear to have been regular and legally fair in all respects. The evidence supports beyond any reasonable doubt the verdict with its implied findings that the killing was with malice aforethought (Pen. Code, § 187), that there was manifest on the part of defendant a deliberate intention unlawfully to take the life of deceased (Pen. Code, § 188), and that the murder was willful, deliberate, and premeditated (Pen. Code, § 189). It does not appear that the defendant was insane at the time either of the homicide or of trial. The defendant apparently believed that he had reasons for committing the homicide which, in his opinion, justified his act. He voluntarily returned from Victorville to San Bernardino and offered no resistance to arrest. He testified that on being arrested he told the officers, "I didn't want to run off, that I wanted to do to them as they would do to me, I had killed her and I am willing to be killed."

Under the law which denies to individuals, even though they be sorely aggrieved, any right to be judge and executioner in such cases, the judgment must be, and is, affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.